UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE KLIMOWICZ,

        Plaintiff,

v.                                  Case No. 23-cv-12522
                                      Honorable Linda V. Parker

JOHNSON CONTROLS, INC,

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 25)

On October 5, 2023, Plaintiff Jamie Klimowicz, initiated this lawsuit[1] against his then-employer, Johnson Controls, Inc. ("JCI"), alleging that JCI violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 *et seq.*  (ECF No. 5 at PageID.40-43.)  Mr. Klimowicz claims that JCI violated these laws by failing to accommodate his disability, relapse and remitting multiple sclerosis ("RRMS"), discriminating against him based on his disability by failing to accommodate him and constructively

---

[1] Mr. Klimowicz filed an Amended Complaint on October 11, 2023.  (ECF No. 5.)

discharging him (Count I), and subsequently retaliating against him by terminating

him (Count II).[2]  (*Id*. at PageID.40-42.)

This matter is presently before the Court on JCI's Motion for Summary

Judgment pursuant to Federal Rule of Civil Procedure 56(c), which has been fully

briefed.  (*See* ECF Nos. 25, 31, 34.)  Finding the facts and legal arguments

adequately presented in the parties' filings, the Court is dispensing with oral

argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the

reasons that follow, the motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

### A. Mr. Klimowicz's Disability

In 2003, Mr. Klimowicz was diagnosed with RRMS, a medical condition

characterized by flare-ups with periods of remission.  (ECF No. 31 at PageID.

1170.)  Mr. Klimowicz's neurological doctor, Martin Belkin, describes the

condition as an underlying neurological condition "that affects the brain, spinal

cord, nerves, and muscles."  (*Id*.; ECF No. 25-26 at PageID.528.)  Mr.

Klimowicz's flare-ups and symptoms are primarily triggered by excessive

exposure to heat and climbing.  (ECF No. 31 at PageID.1171.)  For instance,

working outdoors in excessive heat and climbing large numbers of stairs can

---

[2] Mr. Klimowicz notes in his response brief that his retaliation claim (Count II)
proceeds under federal law only.  (*See* ECF No. 31 at PageID.1194 n.6).

2

exacerbate his condition.  (ECF No. 25-50 at PageID.685.)  Thus, he tries to manage his disability by limiting his exposure to certain environments and physical activities.  (ECF No. 31 at PageID.1170.)  Medications Mr. Klimowicz takes for his disability also restricts his ability to work in certain environments.  (*Id*. at PageID.1176.)  For example, he takes a medication that compromises his immune system and prevents him from working near unsanitary environments such as human waste material.  (*Id*.)

**B.  Mr. Klimowicz's Employment at JCI**

Despite his condition, Mr. Klimowicz has maintained employment primarily as a journeyman mechanic since 1996.  (*Id*. at PageID.1171.)  Generally, a journeyman mechanic performs repairs and maintenance on heating, ventilation, and air conditioning ("HVAC") equipment.  (*See id*. at PageID.1172; ECF No. 25 at PageID.137.)  In 2015, he obtained a job working for JCI as a HVAC journeyman mechanic through a local union.  (ECF No. 31 at PageID.1171.)  While employed at JCI, he maintained a good work record and performed well as a journeyman.  (*Id*. at PageID.1185.)  The parties dispute the specific duties of a journeyman employed at JCI, but acknowledge in their briefs that the position generally requires some degree of physical activity, like climbing stairs and ladders, lifting heavy equipment, and kneeling in order to access and work on equipment.  (*See id*. at PageID.1195-96; ECF No. 25 at PageID.137.)  The parties

3

also agree that the position required journeymen to work in environments that exposed them to varying weather conditions, including extreme heat.  (ECF No. 31 at PageID.11723; ECF No. 25 at PageID.138.)

JCI's services include contracting with entities to provide HVAC services in commercial and industrial settings.  (*See* ECF No. 25-5 at PageID.252.)  For example, JCI has a contract with Great Lakes Water Authority ("GLWA") and assigns its journeymen to perform work at GLWA's various facilities, which consists of "five water treatment plants and roughly [nineteen] water distribution sites." (*See id*.; ECF 31 at PageID.1171; *see also* ECF No. 25 at PageID.146.)

Although Mr. Klimowicz was not assigned any journeyman work during his first six years at JCI, JCI eventually assigned him to work at GLWA facilities in February 2021 to perform HVAC maintenance and repair work.  (ECF No. 31 at PageID.1171; ECF No. 25 at PageID.137.)  Mr. Klimowicz testified that, a few months into his assignment at GLWA, his manager instructed him to pick a GLWA plant where he would be permanently stationed, to which Mr. Klimowicz chose the Springwell Plant.  (ECF No. 31 at PageID.1171; ECF No. 31-2 at PageID.1280.)  Mr. Klimowicz eventually began working out of Springwell on July 20, 2021.  (ECF No. 25-9 at PageID.404.)  Mr. Klimowicz's timesheet shows that he spent much of his time time working at the Springwell location from that day through July 2022 while also performing work at other GLWA sites.  (*See id*.

4

at PageID.397.) While working at Springwell, Mr. Klimowicz performed his duties without any accommodations for his disability. (ECF No. 31 at PageID.1172.)

In July 2022, JCI designated Mr. Klimowicz as a lead journeyman and gave him a raise. (*Id*. at PageID.1174.) He, however, held the position only briefly. To avoid working with his former supervisor,[3] Mr. Klimowicz relinquished his title as lead journeyman in January 2023 and requested to return to his previous position at Springwell. (*Id*. at PageID.1175; ECF No. 25 at PageID.141.) Mr. Klimowicz continued his work as a journeyman mechanic at Springwell while also occasionally performing work at other sites. (ECF No. 31 at PageID.1175; *see* ECF No. 25-9 at PageID.445-449.)

A few weeks later, on February 3, 2023, JCI reassigned Mr. Klimowicz from Springwell to one of GLWA's wastewater treatment plants that processed contaminated water. (ECF No. 31 at PageID.1176.) The same day of the reassignment, Mr. Klimowicz submitted a doctor's note to JCI notifying it that he could not work at the facility due to his underlying neurological condition. (*Id*.; ECF No. 25-16 at PageID.495.) JCI granted the request and allowed Mr. Klimowicz to remain at Springwell. (ECF No. 31 at PageID.1176.)

---

[3] At that time, Mr. Klimowicz believed that his supervisor, Glenn Fackler, was retaliating against him due to an internal complaint Mr. Klimowicz filed against Mr. Fackler for an alleged safety violation. (ECF No. 31 at PageID.1175.)

When he returned to Springwell, Mr. Klimowicz's issues with his supervisor continued.  (*Id*.)  On March 15, 2023, Mr. Klimowicz submitted a doctor's note to JCI wherein Dr. Belkin explained that the harassment Mr. Klimowicz suffered under his supervisor compromised Mr. Klimowicz's condition.  (ECF No. 25-17 at PageID.497.)  Dr. Belkin advised JCI to assign Mr. Klimowicz a new supervisor as an accommodation.  (*Id*.)

At that point, Mr. Klimowicz began working with Dawn Graham, JCI's Human Resources Manager, and Mark Williams, JCI's GLWA Branch Service Manager, on the accommodation request.  (ECF No. 31 at PageID.1177.)  Ms. Graham and Mr. Williams decided to reassign Mr. Klimowicz to the Detroit Water and Sewerage Department ("DWSD") facility where he would report to a different supervisor.  (*Id*.; ECF No. 25 at PageID.143.)

## C. Mr. Klimowicz's Accommodation Request and JCI's Information Requests

Mr. Klimowicz reported to DWSD on April 10, 2023, to work, but he did not stay long.  (ECF No. 25 at PageID.143.)  Mr. Klimowicz left early because the environment triggered a flare-up.  (ECF No. 31 at PageID.1177.)  The number of stairs and exposure to the heat caused numbness in his legs and hindered his ability to walk.  (*Id*.)  On the evening of that same day, Mr. Klimowicz emailed Mr. Williams informing him that he was "dealing with some medical concerns related

to [his] underline disabilities and . . . will not be in for a few days." (ECF No. 31-7 at PageID.1494.)

A couple of days later, on April 12, 2023, Mr. Klimowicz explained to Ms. Graham that the DWSD site caused issues for his disability. (ECF No. 25-50 at PageID.706-07.) In revealing for the first time that he had MS, Mr. Klimowicz explained that the number of stairs, lack of elevator access, and the amount of time he had to spend on the roof, which generated extreme heat due to the black tar, put him back under his doctor's care. (*Id*.) He further stated that he never wanted to leave Springwell and preferred that facility because working there did not cause any issues for his condition. (*Id*. at PageID.707.) Shortly after, Mr. Klimowicz and Ms. Graham talked on the telephone to discuss the email about his placement at DWSD as well as his restrictions. (*Id*. at PageID.831; ECF No. 31 at PageID.1179.) The call concluded with Mr. Klimowicz agreeing to provide a note from his doctor with more information about the physical and environmental restrictions related to his disability. (ECF No. 25-50 at PageID.831)

From that point, the parties and Dr. Belkin engaged in an eight-month dialogue consisting of numerous emails and phone calls. During this period, Mr. Klimowicz did not receive any paychecks from JCI. (ECF No. 31 at PageID.1178.) The Court takes on the hefty task of summarizing the key events and communications that occurred throughout each month.

7

### 1. April 2023

Within days of Mr. Klimowicz's call with Ms. Graham, Dr. Belkin provided his first note to JCI regarding Mr. Klimowicz's MS condition and work restrictions on April 14, 2023.  (*Id.* at PageID.1180; ECF No. 25-50 at PageID.684.)  Based on information he received from Mr. Klimowicz about his duties as a journeyman, Dr. Belkin advised that Mr. Klimowicz should avoid working in environments with "exposure to excessive and prolonged heat" that required him to climb more than four flights of stairs.  (ECF No. 25-50 at PageID.684.)  Dr. Belkin submitted a more detailed note on April 19, 2023, after JCI informed Mr. Klimowicz that it needed more clarity on his restrictions.  (ECF No. 25-50 at PageID.685; ECF No. 31 at PageID.1180.)  In the new note, Dr. Belkin explained that Mr. Klimowicz provided him a summary of his job responsibilities as a journeyman and recommended that Mr. Klimowicz avoid, among other things, constant and continuous kneeling, working beyond the cooler periods of the workday, constant heavy lifting, working with wastewater sites, and constantly climbing ladders and multiple stairs.  (ECF No. 25-50 at PageID.685.)

Throughout the month of April, Ms. Graham and Mr. Williams held two calls with Mr. Klimowicz to discuss his restrictions and limitations and his input about the facilities and his corresponding duties.  (*See id.* at PageID.661-62; *see generally* ECF No. 31-23.)  During their last call on April 24, 2023, Mr.

Klimowicz explained that he could perform his duties at Springwell given the placement of the equipment and the number of stairs at that site. (ECF No. 31 at PageID.1181.) Nevertheless, Ms. Graham and Mr. Williams indicated that they needed more clarification on his restrictions, such as Dr. Belkin's definitions of "reasonable" and "constantly." (ECF No. 25-50 at PageID.662.)

   *2. May 2023*

   At JCI's request, Dr. Belkin provided an additional medical note on May 4, 2023. (ECF No. 31 at PageID.1182.) In attempting to provide JCI with specific accommodations and restrictions, the note consisted of a description of Mr. Klimowicz's work environment and physical requirements, which Mr. Klimowicz provided to Dr. Belkin. (ECF No. 25-26 at PageID.528.) According to Mr. Klimowicz, he occasionally worked on top of roofs one to two times a week from 6:00 a.m. to 9:00 a.m. to avoid hotter periods; he rarely used ladders because the equipment he worked on was waist level; he had limited kneeling requirements and kneeled only three to five times a week for no more than five minutes; and he climbed stairs once or twice a week with a limit of thirty individual steps. (*Id.* at PageID.529.) Dr. Belkin reviewed the information and concluded in his medical note that Mr. Klimowicz was "medically fit to perform his job under [the listed] conditions without compromise." (*Id.* at PageID.528-29.)

Mr. Williams reviewed the medical note and informed Ms. Graham that Mr. Klimowicz could not work within the restrictions outlined in the note due to the duties expected of journeymen at various facilities.  (ECF No 25-50 at PageID.702.)  As part of his review, Mr. Williams visited Springwell and assessed the facility, providing pictures of the equipment and explaining his version of the job requirements.  (*Id.*)  For example, he took pictures of mixing tanks and air handling units and noted that the placement of the equipment would require an employee to kneel or crouch to perform repairs.  (*Id.*)  Mr. Williams concluded that Mr. Klimowicz would have challenges at Springwell and other GLWA facilities. (*Id.*)

On May 16, 2023, Mr. Williams and Ms. Graham held a call with Mr. Klimowicz to discuss Dr. Belkin's May 4th note.  (*See* ECF No. 28-3 at PageID.1112.)  They expressed that they were trying to figure out how to accommodate Mr. Klimowicz at Springwell and other sites while ensuring that he could perform troubleshooting and major repairs–duties they considered to be essential functions.  (*Id.*)  The call ended with Mr. Williams stating that the next step of the process would be for him to assess other sites and talk to other journeymen to identify a facility that could accommodate Mr. Klimowicz.  (*Id.* at PageID.1113.)  In deposition, he testified that he did not assess any additional sites or talk to other journeymen. (ECF No. 31-17 at PageID.1877.)

Mr. Klimowicz emailed Ms. Graham at least four times throughout the month of May, asking for updates and reiterating that he was physically capable of working at Springwell.  (*See* ECF No. 25-50 at PageID.663-66.)  In one of his emails, Mr. Klimowicz mentioned that he intended to file for unemployment to support his family and that he believed that JCI was discriminating against him based on his medical condition.  (ECF No. 25-50 at PageID.778.)  Ms. Graham confirmed receipt of his emails in each instance, and, in one instance, another human resources manager explained to him that JCI was still exploring accommodation options.  (*Id.* at PageID.783.)

On May 30, 2023, Mr. Klimowicz provided a fourth medical note to JCI in hopes that it would provide more clarity on his limitations and allow him to return to work.  (ECF No. 31 at PageID.1186.)  Dr. Belkin declared in the note that Mr. Klimowicz's condition would not prevent him from performing work at Springwell.  (ECF No. 25-50 at PageID.789.)

3.  *June 2023*

On June 8, 2023, Ms. Graham emailed Mr. Klimowicz explaining that the May 4th medical note was unclear, and they needed more information.  (*Id.* at PageID.695.)  She informed him that Lincoln Financial, JCI's disability accommodation consultant, would manage the interactive process moving forward and instructed Mr. Klimowicz to work with them to initiate that process.  (*Id.*; ECF

11

No. 25 at PageID.144.)  She also informed Mr. Klimowicz that JCI needed to ensure that Dr. Belkin's recommendations were based on accurate information about Mr. Klimowicz's job duties and requirements.  (ECF No. 25-50 at PageID.693.)  Thus, she provided Mr. Klimowicz with a job description for Lincoln Financial and Dr. Belkin to reference.  (*Id*. at PageID.695.)  In their depositions, Ms. Graham and Mr. Williams testified that they worked together to create the job description, and the description was not an official company document.  (*See* ECF No. 31-17 at PageID.236; ECF No. 31-8 at PageID.155.)  The job description specified that journeymen were required to work on HVAC equipment, performing repairs, preventative maintenance, routine servicing, and, among other physical requirements, climb ladders and stairs, walk frequently, crawl, and squat.  (ECF No. 25-50 at PageID.680.)  Mr. Klimowicz testified that he provided the description to Dr. Belkin.  (ECF No. 31-2 at PageID.1258.)  Dr. Belkin testified that he would have relied on the description provided by JCI to complete the form.  (ECF No. 31-3 at PageID.1358.)

After some delay in receiving the paperwork from Dr. Belkin, Mr. Klimowicz notified Ms. Graham that he provided the documents to Lincoln Financial.  (*Id*. at PageID.690-91, 791-94; ECF No. 25-34 at PageID.584.)  In one of the documents, Dr. Belkin indicated that Mr. Klimowicz "may have to be absent for brief periods when his condition is episodic" and that Mr. Klimowicz should be

reinstated to "his prior work position at the Springwell plant where he has worked for the past two years without issue" as an accommodation.  (ECF No. 34 at PageID.2440; ECF No. 25-34 at PageID.584.)

### 4. July 2023

On July 14, 2023, a Lincoln Financial consultant, Sharonda Hicks, reached out to Mr. Klimowicz to set up a phone call to discuss his accommodation request, disability, and work duties, but the call did not come to fruition.  (ECF No. 25-50 at PageID.795.)  Based on email communications between Mr. Klimowicz and Ms. Hicks, they scheduled a call, but she was unable to reach Mr. Klimowicz at the time they scheduled.  (*Id*. at PageID.801.)  Mr. Klimowicz claimed that he did not receive the call and asked that she send any requests in writing.  (*Id*. at PageID.799.)  Ms. Hicks continued to follow up with Mr. Klimowicz and, in making a second request for a call, explained that a phone call was necessary to move forward with the accommodation request.  (*Id*. at PageID.708-09.)

### 5. August 2023

Despite not speaking to Mr. Klimowicz about his accommodation request, Ms. Hicks reviewed his medical documentation and job description.  (*Id*. at PageID.729-31.)  She prepared a report for Ms. Graham detailing various accommodation options for Mr. Klimowicz.  (*Id*.)  Some of her recommendations included placing Mr. Klimowicz permanently at Springwell or, in the alternative,

implementing other restrictions, such as limiting his exposure to prolonged heat, eliminating duties that required lifting over fifty pounds, and avoiding assignments at wastewater facilities.  (*Id*.)

Ms. Graham informed Ms. Hicks that the assessment was insufficient for their needs and JCI needed more information about Mr. Klimowicz's medical condition.  (*Id*. at PageID.722.)  Ms. Graham stated that she needed clarification about the episodes Mr. Klimowicz's condition caused and instructed Ms. Hicks to contact Dr. Belkin for information on how often they occurred.  (*Id*.)  Dr. Belkin informed JCI, through Lincoln Financial, that Mr. Klimowicz's condition is permanent, and the frequency and duration of his episodes are unknown.  (*Id*. at PageID.714, 803.)  Mr. Klimowicz also informed Lincoln Financial that it was impossible to predict the frequency of his episodes.  (*Id*. at PageID.713.)  Mr. Klimowicz also continued to reiterate his desire to return to Springwell.  (*Id*.)

*6. September 2023*

After meeting with JCI's compliance team, Ms. Graham and Mr. Williams held another call with Mr. Klimowicz on September 15, 2023, to further discuss the requirements of his role at JCI and how JCI could accommodate him.  (*Id*. at PageID.726, 732-33; ECF No. 28-2. at PageID.1099.)  During the call, Ms. Graham and Mr. Williams shared that they still needed clarity on the restrictions and limitations listed in Dr. Belkin's April 19th and May 4th medical notes as well

14

as Mr. Klimowicz's job role.  (ECF No. 28-2. at PageID.1099, 1105.)  According to Ms. Graham and Mr. Williams, Mr. Klimowicz did not provide Dr. Belkin with an accurate and complete description of his job duties and requirements.  (*Id.* at PageID.1106.)  When they asked about his job duties at Springwell, such as working on top of roofs and climbing stairs, Mr. Klimowicz simply responded that he could do his job, and his doctor cleared him to work at Springwell without any accommodations.  *(See id.* at PageID.1102.)  Ms. Graham and Mr. Williams continued to emphasize that Dr. Belkin's notes were "based off of . . . [Mr. Klimowicz's] job requirements that [he] communicated to [Dr. Belkin], but . . . there are more to those requirements than what was said to [Dr. Belkin]."  (*Id.* at PageID.1105.)  They also explained that Springwell did not have forty hours of work available for Mr. Klimowicz and he would be required to work at other facilities.  (*Id.* at PageID.1103.)  The call ended with Mr. Klimowicz stating that the call was "argumentative and hostile."  (*Id.* at PageID.1107.)

After the call, Mr. Klimowicz sent a follow-up email to Ms. Graham and Mr. Williams, stating that he felt badgered during the call and the call covered the same questions and information they discussed on May 16, 2023.  (ECF No. 31-7 at PageID.1486.)  The record does not reflect a response from Ms. Graham or Mr. Williams.

   7.  *October 2023*

On October 5, 2023, Mr. Klimowicz filed the instant lawsuit.  (ECF No. 1.)
On October 6, Ms. Graham emailed Ms. Hicks asking her to send Dr. Belkin (1) a
document that she and Mr. Williams created comparing Mr. Klimowicz's version
of his job duties against their version and (2) a questionnaire asking Dr. Belkin
whether Mr. Klimowicz could perform the job requirements based on the
comparison document.  (ECF No. 25-50 at PageID.720-21, 738; ECF No. 31-8 at
PageID.1577.)  The document consisted of descriptions and information similar to
the job description that JCI provided Dr. Belkin in June.  (*See* ECF No. 25-3 at
PageID.229.)  Ms. Graham sent the document and questionnaire to Dr. Belkin on
or around October 9, 2023, and asked him to respond by October 24, 2023.  (*See
id*. at PageID.719-20.)

     *8.  November 2023*

While waiting for Dr. Belkin to respond to the latest request, Mr. Klimowicz
reached out to Ms. Hicks on two occasions, telling her that the requested
information was repetitive and that they had enough information to decide on his
accommodation request.  (*See id*. at PageID.710.)

On November 14, 2023, Dr. Belkin responded to Ms. Hicks.  (*Id*. at
PageID.715.)  Based on the comparison document, he indicated in the
questionnaire that Mr. Klimowicz was physically capable of doing his job at
Springwell, Mr. Klimowicz could return to work at any time, and his previous

notes contained information about Mr. Klimowicz's specific limitations and restrictions.  (*Id*. at PageID.715, 186-87; ECF No. 25-41 at PageID.629.)

### D. JCI's Return Offer

On December 1, 2023, Mr. Williams sent Mr. Klimowicz a letter instructing him to return to work in accordance with Dr. Belkin's latest medical note.  (ECF No. 25-42 at PageID.631.)  The letter explained that Mr. Klimowicz would return to work based out of Springwell and provide support to the other GLWA clean water sites as directed by his assigned supervisors and leads.  (*Id*.)  The letter indicated that, upon his signed acknowledgement of the letter, Mr. Klimowicz would begin his position on December 11, 2023.  (*Id*. at PageID.632.)  Mr. Klimowicz did not sign the letter.

On December 8, 2023, counsel for Mr. Klimowicz responded to JCI, pointing out what she believed to be deficiencies in the offer and stating that Mr. Klimowicz would not return to work on December 11, 2023.  (ECF No. 25-50 at PageID.852.)  Amidst subsequent communications regarding discovery in this matter, counsel for JCI inquired several times whether Mr. Klimowicz intended to return to work in his prior position.  (ECF No. 25-50 at PageID.853, 855, 858, 863.)  After reiterating her issue with the offer and noting that the letter ignored Dr. Belkin's restrictions and limitations, Mr. Klimowicz's counsel stopped

communicating with JCI.  (*See Id*. at PageID. 860.)  On January 12, 2024, Mr. Williams issued Mr. Klimowicz a termination letter.[4]  (*Id*. at PageID.847.)

## II.    STANDARD OF REVIEW

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To

---

[4] The letter is dated January 12, 2024, but JCI claims that it was sent on January 17, 2024.  (ECF No. 34 at PageID.2444 n.4.)  The parties do not dispute this discrepancy, and it does not have any bearing on the Court's decision.

demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the nonmovant's evidence and draw "all justifiable inferences" in the nonmovant's favor.  *See id*. at 255.

## III.  ANALYSIS

JCI maintains that it is entitled to judgment as a matter of law as to Mr. Klimowicz's retaliation claim and two discrimination-based claims: failure to accommodate and constructive discharge.  (*See* ECF No. 25 at PageID.127.)

As a threshold matter, the Court notes that Michigan sets forth the same prohibitions as the ADA in the PWDCRA.  "The PWDCRA 'substantially mirrors' the ADA, and a resolution of [a plaintiff's] ADA claims will 'generally, though not always, resolve the plaintiff's PWDCRA claim.'"  *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (quoting *Donald v. Sybra, Inc*., 667 F.3d 757, 764 (6th Cir. 2012)).  Thus, the Court analyzes Mr. Klimowicz's ADA and Michigan claims identically.  *Id*.; *Chiles v. Mach. Shop, Inc*., 606 N.W.2d 398, 405 (Mich. Ct. App. 1999) ("[The Michigan Court of Appeals] and the Michigan Supreme Court have noted that the federal [ADA] and the PWDCRA share the same purpose and use similar definitions and analyses, and both courts have relied on the ADA in interpreting the PWDCRA.").

19

The Court addresses each claim and the corresponding arguments in turn.

## A. Failure to Accommodate Claim

Viewing the record in the light most favorable to Mr. Klimowicz, the Court finds a genuine issue of material fact as to whether Mr. Klimowicz was a qualified person with a disability and whether JCI fulfilled its obligation to provide Mr. Klimowicz a reasonable accommodation.

The ADA makes it unlawful to discriminate "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination, as defined by the statute, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business . . . ." *Id.* § 12112(b)(5)(A).

A plaintiff "can prove discrimination under the ADA in two ways, either directly or indirectly." *Blanchet v. Charter Commc'ns*, LLC, 27 F.4th 1221, 1227 (6th Cir. 2022) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018)). "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862,

868 (6th Cir. 2007)).  As acknowledged by both parties, Mr. Klimowicz's claim is based on his belief that JCI failed to accommodate his disability.  (ECF No. 31 at PageID.1194; ECF No. 25 at PageID.150.)  The Court therefore applies the framework for analyzing direct evidence cases.

Mr. Klimowicz bears the initial burden of setting forth specific facts showing that "(1) [he] was disabled within the meaning of the ADA; (2) [he] was otherwise qualified for [his] position, with or without reasonable accommodation; (3) [JCI] knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) [JCI] failed to provide the necessary accommodation." *Brumley v. United Parcel Serv., Inc*., 909 F.3d 834, 839 (6th Cir. 2018).  Once Mr. Klimowicz establishes his prima facie case, the burden then shifts to JCI to prove that "a proposed accommodation will impose an undue hardship upon the employer."  *Id*.  (quoting *Kleiber*, 485 F.3d at 868-69).

The parties do not contest the first, third, or fourth prongs.  Mr. Klimowicz has a disability (MS) that JCI knows about, and Mr. Klimowicz requested an accommodation based on his disability.  At issue is whether Mr. Klimowicz was "otherwise qualified" and whether JCI failed to provide Mr. Klimowicz the necessary accommodation for his disability.

1. *"Otherwise Qualified"*

21

Under the ADA, "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In this context, "'qualified' means that the individual satisfies the requisite skill, experience, education and other job-related requirements" necessary for the position and the corresponding essential duties. 29 C.F.R. § 1630.2(m). The essential functions of a particular job may be evidenced by what the employer considers to be essential, the terms of a collective bargaining agreement, and the work experience of past and current employees in that position. 29 C.F.R. § 1630.2(n)(3). "Whether an individual meets the definition of a qualified individual with a disability is to be determined at the time the employment decision was made." *Cummings v. Dean Transp., Inc.*, 9 F. Supp. 3d 795, 801-02 (E.D. Mich. 2014) (citing *Thoms v. ABF Freight Sys., Inc.*, 31 F. Supp. 2d 1119, 1124 (E.D. Wis. 1998).

Here, JCI argues that Mr. Klimowicz is not qualified to perform the requirements of a HVAC journeyman job for two reasons. (ECF No. 25 at PageID.151.) First, JCI claims that Mr. Klimowicz lacks the "skill, experience, education and other job-related requirements" he needs to be a journeyman. (*Id.*) Relying on "after-acquired evidence," JCI contends that Mr. Klimowicz's experience and credentials as a journeyman do not stack up against the

22

requirements outlined in JCI's contract with GLWA or in the local and national collective bargaining agreements.  (*Id*. at PageID.151-52.)  JCI concludes that, without these prerequisites, Mr. Klimowicz cannot perform the essential functions of a journeyman for JCI at GLWA sites, thereby making him unqualified.  (*Id*.)  Second, JCI asserts that Mr. Klimowicz's rejection of its offer to return to work based out of Springwell makes him unqualified under the ADA.  (*Id*.)

Mr. Klimowicz responds that he was not only qualified to perform his job with an accommodation, but his track record at JCI shows that he completed his job duties without an accommodation despite not having specific credentials or work experience.  (ECF No. 31 at PageID.1195, 1200-01.)

The Court does not find JCI's "after-acquired evidence" argument compelling because there is a triable issue as to whether Mr. Klimowicz's credential and license deficiencies are "of such severity that [Mr. Klimowicz] in fact would have been terminated on those grounds alone if [JCI] had known of [the deficiencies] at the time of the discharge."  *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996), *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996) (quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 363 (1995)).  JCI does not clearly indicate when it obtained the information about Mr. Klimowicz's background and credentials, but Mr. Klimowicz testified

23

that "both the Union and JCI had [his] resume at the time he was hired, which accurately listed his experience and credentials." (ECF No. 31 at PageID.1201.)

Mr. Klimowicz also testified that, before JCI hired him (and without being certified through the local union), the former business manager of the local union informed him that he possessed the necessary certifications and knowledge to be a journeyman, which allowed Mr. Klimowicz to be "ticketed in" as a journeyman. (*Id.*; ECF No. 31-2 at PageID.1245.) According to Mr. Klimowicz, "ticketing-in" is a practice for individuals to become journeymen without completing the usual apprentice training programs. (*Id.*) Moreover, at the time JCI hired Mr. Klimowicz, he held other certifications issued by the state of Michigan, including licenses for contracting, boilers, and piping service. (ECF No. 31 at PageID.1200; ECF No. 25-2 at PageID.173, 177.) Mr. Klimowicz also indicates that JCI employed other journeymen that lacked certain credentials. (ECF No. 31 at PageID.1201.) JCI does not dispute these arguments.

JCI also does not challenge Mr. Klimowicz's claim that, during his employment, JCI never instructed him to obtain the credentials required by the GWLA contract and bargaining agreements. (*Id.* at PageID.1201.) Understandably so. As set forth in the record, JCI briefly designated Mr. Klimowicz as a lead journeyman in 2022 and, up to the point of his termination,

wanted him to remain a journeyman at JCI.  (*See id*. at PageID.1173; ECF No. 25 at PageID.154.)

Considering these facts in the light most favorable to Mr. Klimowicz, the record shows that certain prerequisite work experience, training, and certifications were not essential functions of Mr. Klimowicz's job as a journeyman.  These facts create a genuine issue of material fact as to whether Mr. Klimowicz was "otherwise qualified" despite him lacking those prerequisites.

With respect to JCI's argument that Mr. Klimowicz is not a qualified individual based on his rejection of the offer, as explained below, the record evidences a sufficient disagreement as to whether JCI's accommodation was reasonable.  Therefore, his rejection of the return offer does not make him unqualified for purposes of his claim.

The Court finds that Mr. Klimowicz has carried his burden to establish the second prong of his prima facie case.

## 2. *Provide Necessary Accommodations*

As the parties discuss, implicit in the fifth prong of Mr. Klimowicz's claim–failure to provide the necessary accommodation–is the requirement that the employer initiate "an informal interactive process" to determine how an employee's disability limits him so that reasonable accommodations for the disability can be identified.  *See Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d

805, 812 (6th Cir. 2020); *Arndt v. Ford Motor Co.*, 716 F. App'x 519, 528 (6th Cir. 2017); 29 CFR § 1630.2(o)(3). This process requires good faith and collaboration from both parties. *Kleiber*, 485 F.3d at 871. "When a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id*. (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). However, liability for failing to engage in the interactive process requires that a reasonable accommodation actually existed.

Just as an employer has an obligation to provide a reasonable accommodation to an employee with a disability, the Sixth Circuit makes clear that an employee bears the burden to propose at least one objectively reasonable accommodation. *Tchankpa*, 951 F.3d at 812-13; *see Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (holding that the employee may survive summary judgment when he can "[meet] his burden to show that a reasonable accommodation was possible"). A reasonable accommodation is defined, in relevant part, as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Typically, "[t]he reasonableness of a proposed accommodation is a question of fact." *Fisher*

26

*v. Nissan N. Am., Inc*., 951 F.3d 409, 419 (6th Cir. 2020) (citing *Cassidy v. Detroit Edison Co*., 138 F.3d 629, 634 (6th Cir. 1998)).  However, caselaw and the ADA provide guideposts to determine reasonableness.

For instance, an accommodation may be deemed unreasonable if it eliminates essential functions from a position or otherwise imposes an undue hardship on the operation of a business.  *See E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 761 (6th Cir. 2015).  In determining the essential functions of a particular position, the Court may give weight to the employer's written job descriptions and operational judgment.  *Id*. at 761-62; 42 U.S.C. § 12111(8).  The ADA also does not require employers to create new jobs or convert temporary roles into permanent ones.  *Burns v. Coca-Cola Enters., Inc*., 222 F.3d 247, 257 (6th Cir. 2000).  At the same time, the Sixth Circuit has recognized that minor workplace adjustments can be reasonable where they enable performance without undue hardship.  *Hostettler*, 895 F.3d at 857.

Moreover, reassignment can be reasonable but ordinarily is not when it conflicts with non-discriminatory employment policies absent certain special circumstances.  *See Burns*, 222 F.3d at 257; 42 U.S.C. § 12111(9)(B).  A special circumstance may exist "if the plaintiff [can] show . . . that the employer, having retained the right to change [a policy], exercises that right fairly frequently, reducing employee expectations that the system will be followed–to the point

where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002).

JCI raises several arguments under this prong.  It argues that Mr. Klimowicz's request was not objectively reasonable because it created a new position.  (ECF No. 34 at PageID.2427.)  JCI contends that it satisfied the ADA by offering Mr. Klimowicz a reasonable accommodation, but Mr. Klimowicz rejected the accommodation and did not propose any alternative accommodations.  (ECF No. 25 at PageID.153.)  Lastly, according to JCI, there is insufficient evidence that JCI acted in bad faith or is liable for the delay in the interactive process.  (*Id*. at PageID.155.)

Mr. Klimowicz responds that he proposed a reasonable and simple accommodation: return to the Springwell facility as a team lead, performing the same duties he had for over a year.  (ECF No. 31 at PageID.1201-02, 1204-05.)  Rather than granting his request or, in the alternative, denying it and identifying an undue hardship, Mr. Klimowicz argues that JCI did not offer an accommodation at all.  (*Id*.)

a. *Mr. Klimowicz's proposed accommodation*

The Court does not share JCI's view that Mr. Klimowicz requested to work exclusively out of Springwell.  As JCI points out, Mr. Klimowicz acknowledged

that he occasionally worked at other facilities while primarily working at Springwell.  (ECF No. 31 at PageID.1203.)  In fact, Mr. Klimowicz noted in his brief that "all [he] requested was to do the same job he had done at Springwells for over one year, which would have included leaving the Plant periodically to provide his expertise."  (*Id.*)

Even if the request created a new position, JCI recognized that Mr. Klimowicz "shape[d] the [j]ourneyman job he wanted" "[t]hrough March 2023" (ECF No. 34 at PageID.2438), which could lead a reasonable jury to infer that the requested position would cause only minor workplace adjustments or be deemed a reassignment that would not make a difference, i.e., no undue hardship.  A reasonable jury could also find that Mr. Klimowicz meets his initial burden in showing that the accommodation is reasonable because the position would not eliminate any essential job functions identified by JCI.[5]  As JCI notes, Mr. Klimowicz repeatedly insisted on this particular accommodation throughout the interactive process.  (*See* ECF No. 34 at PageID.2440.)  Yet, JCI continued with the interactive process and never expressly denied the request.

---

[5] To the extent the request diminishes any essential functions, the argument would still fail because the record indicates that the job descriptions JCI relied on were prepared during the course of the interactive process.  42 U.S.C. § 12111(8) (advising that credit to a job description should be limited to descriptions prepared "before advertising or interviewing applicants for the job").  Given the parties' dispute about the essential functions of Mr. Klimowicz's role, a triable issue exists.

b.  *JCI's proposed accommodation*

JCI maintains that the interactive process "ended with a reasonable accommodation: JCI would base [Mr. Klimowicz] at the Springwell plant (his desired location), he would go to other sites as needed, and if he came across a situation where he could not safely perform the work or an accommodation was needed, he would alert JCI."  (*Id*. at PageID.2428.)

The letter indicated that the job assignment was in accordance with Dr. Belkin's November medical note.  (ECF No. 25-42 at PageID.631.)  The letter went on to explain that Mr. Klimowicz would be required to perform the essential functions of a journeyman, such as repairs, replacements, and occasional apprentice-level work, which would entail climbing ladders and stairs, bending, kneeling, lifting, and similar actions.  (*Id*. at PageID.631-32.)  JCI also stated in the letter that the position would require him to "work in a variety of environments including, but not limited to: [b]asements, outdoors, roofs, mechanical rooms, above ceilings" and "[e]xposure to outdoor elements during the hours between 7am - 4pm."  (*Id*.)  Lastly, the letter advised Mr. Klimowicz to contact Mr. Wiliams and Ms. Graham if he needed an accommodation.  (*Id*. at PageID.632.)  JCI expected Mr. Klimowicz to sign the letter by December 8, 2023, and begin work on December 11, 2023.  (*Id*. at PageID.631-32.)

The note from Dr. Belkin that JCI references advised that Mr. Klimowicz was "able to physically do the job at Springwells" and instructed JCI to see his previous notes for Mr. Klimowicz's specific restrictions and limitations. (ECF No. 25-41 at PageID.629.) Markedly, JCI's return offer did not reference or clearly incorporate said limitations or restrictions.

Mr. Klimowicz takes a different position on the offer. According to him, the offer that JCI extended was not an accommodation, much less a reasonable one, because "it offered a new job that ignored [his] disability and accommodations altogether" and suggested that he had to restart the accommodations process. (ECF No. 31 at PageID.1191-92, 1202.) Mr. Klimowicz asserts that JCI's return offer would require him to work at other sites that could trigger his disability. (*Id*. at PageID.1191.) Construing the record in the light most favorable to Mr. Klimowicz, a reasonable jury could find in Mr. Klimowicz's favor on this issue.

While the ADA does not specify the language employers must use to convey reasonable accommodations, in this instance, JCI's omission of Mr. Klimowicz's restrictions regarding his work duties led Mr. Klimowicz to believe that he could be required to perform work beyond his abilities. Apart from assigning Mr. Klimowicz to only clean water sites and limiting the weight requirements to fifty pounds, the letter is silent as to Mr. Klimowicz's other work limitations. (*See* ECF No. 25-42 at PageID.631-632.)

For instance, Dr. Belkin's April 14 and May 4 notes indicated that Mr. Klimowicz could not be exposed to prolonged and excessive heat and that he should be limited to 6:00 a.m. to 9:00 a.m. shifts on roofs to avoid hotter periods of the day. (*See* ECF No. 25-50 at PageID. 684; ECF No. 25-26 at PageID.528.) Per JCI's letter, Mr. Klimowicz would be expected to perform work outdoors from 7:00 a.m. to 4:00 p.m. (ECF No. 25-50 at PageID.736.) Dr. Belkin's notes also stated that Mr. Klimowicz had specific kneeling and stair limitations, such as climbing only thirty stairs and kneeling only five times per month for five minutes at a time. (*See* ECF No. 25-26 at PageID.529.) As JCI asserts, the journeyman position can be a "labor intensive" job. (*See* ECF No. 34 at PageID.2429.) Without memorializing or referencing Mr. Klimowicz's medical restrictions in its letter *and* including in the letter job requirements that could aggravate his disability, JCI's claims that its accommodation was reasonable, is weakened.

JCI also argues that the return offer letter, in conjunction with the "Welcome Back" letter it created for Mr. Klimowicz, further demonstrates that it intended to fully accommodate Mr. Klimowicz. (ECF No. 25 at PageID.154.) The "Welcome Back" letter indicated that Mr. Klimowicz did not need restrictions at Springwell, but unlike the return offer, it acknowledged Dr. Belkin's restrictions and limitations as to Mr. Klimowicz's duties. (ECF No. 25-50 at PageID.759.) For instance, the "Welcome Back" letter noted that Mr. Klimowicz could not kneel continuously,

work in heat, or constantly climb ladders and stairs.  (*Id*.)  However, Mr.

Klimowicz never received the "Welcome Back" letter.  (*See* ECF No. 31 at

PageID.1193.)  It is also unclear when JCI created the letter.

Confusingly, JCI also appears to argue that Mr. Klimowicz would not need

any accommodations at the other clean water sites because Dr. Belkin cleared Mr.

Klimowicz to work at Springwell without any limitations or restrictions.  JCI

claims that "Springwell and all the other sites where Plaintiff (and all Journeymen)

worked were not unique, required the same physical abilities, had similar work

environments, and required the same work to be performed, i.e., repairing HVAC

equipment."  (ECF No. 34 at PageID.2439.)  This argument is inapposite to the

above.  Here, JCI suggests that it did not intend to provide Mr. Klimowicz any

additional accommodations at the various sites because the sites were similar.

It is also worth remarking that Mr. Williams testified that he only assessed

Springwell during the interactive process and did not conduct any assessments at

the other sites or talk to any journeymen at the other sites to determine whether the

sites could accommodate Mr. Klimowicz.  (ECF No. 31-17 at PageID.1877.)  A

reasonable jury would likely question JCI's determination that all the facilities are

the same or similar.

Construing these facts in the light most favorable to Mr. Klimowicz as the

non-moving party, the Court finds a genuine issue of material fact as to whether

JCI put forth a reasonable accommodation that considered Mr. Klimowicz's limitations and would allow him to perform his duties.  Although JCI had discretion to execute an accommodation of its choosing and was not obligated to grant Mr. Klimowicz's proposed accommodation, a triable issue exists as to whether the chosen accommodation fell short of being effective and reasonable. *Talley v. Fam. Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1108 (6th Cir. 2008) (holding that an employee cannot "force [his] employer to provide a specific accommodation if the employer offers another reasonable accommodation"); *Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 25 (6th Cir. 2004) (holding that the employer "has the ultimate discretion to choose between effective accommodations").

    *c.  Interactive process*

JCI initiated the interactive process on April 12, 2023.  (ECF No. 34 at PageID.2430.)  On that day, Ms. Graham and Mr. Klimowicz had a phone conversation about the email Mr. Klimowicz sent to Ms. Graham requesting to relocate from DWSD due to the physical and environmental conditions that aggravated his disability.  (ECF No. 28-5 at PageID.1130.)  Ms. Graham asked Mr. Klimowicz to provide a note from his doctor describing his exact limitations to which Mr. Klimowicz agreed.  (ECF No. 25-50 at PageID.661; ECF No. 25 at PageID.143.)

While Mr. Klimowicz may have contributed to some of the delays in the interactive process by failing to complete his interview with Lincoln Financial and not fully answering questions during the call in September 2023 (ECF No. 34 at PageID.2436), the onus was on JCI to see the process through and set forth an effective accommodation absent an undue hardship. Because there is a question as to whether the return offer was a reasonable accommodation, a reasonable jury could attribute the breakdown in the interactive process to JCI. *See Arthur v. American Showa, Inc.*, 625 F. 704, 711 (6th Cir. 2015) ("The employer fails to participate in the interactive process only if, among other things, the employee can demonstrate that the employee could have been reasonably accommodated but for the employer's lack of good faith.") (quotations and brackets omitted).

Mr. Klimowicz's failure to propose an alternative after JCI extended the offer also does not resolve this claim at summary judgment. As stated, the interactive process must be conducted in good faith by both parties. Reading the return offer and JCI's subsequent emails, a reasonable jury could find that the offer precluded any further discussion. *See, e.g.*, *Lafata v. Church of Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (finding that the employer acted in bad faith by offering the employee only one accommodation option and failing to discuss other potential reasonable accommodations). For instance, the letter indicated that Mr. Klimowicz had to sign the document in order to return to work.

35

(ECF No. 25-50 at PageID.736.)  Similarly, JCI's follow-up emails to Mr. Klimowicz's counsel could also be viewed as JCI extending the return offer as the only available accommodation.  (*See id*. at PageID.853.)  If a jury credits these interpretations, it could find that JCI ended the process, and Mr. Klimowicz did not act in bad faith by failing to propose an alternative.

In summary, the Court must view the record in the light most favorable to Mr. Klimowicz at this stage.  In doing so, a reasonable jury could conclude that Mr. Klimowicz was "otherwise qualified" to be a journeyman, and despite proposing an imperfect accommodation and causing some delays, the months-long interactive process culminated in JCI failing to provide him with the necessary accommodation without proving an undue hardship.  To add, the record establishes competing interpretations on facts that are material to this claim that cannot be reconciled as a matter of law.

Thus, JCI is not entitled to summary judgment on Mr. Klimowicz's failure to accommodate claim.

## B. Constructive Discharge Claim[6]

Construing the record in Mr. Klimowicz's favor, the Court finds a triable issue as to whether JCI constructively discharged him.

---

[6] For purposes of this claim, the Court considers Mr. Klimowicz's refusal of JCI's offer as his resignation from JCI.

The ADA makes it unlawful for an employer "to discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ."  42 U.S.C. § 12112(a).  A plaintiff may demonstrate an unlawful discharge under a constructive discharge theory.  Constructive discharge occurs when "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Talley*, 542 F.3d at 1107 (quoting *Held v. Gulf Oil Co*., 684 F.2d 427, 432 (6th Cir. 1982)); *Laster v. City of Kalamazo*o, 746 F.3d 714, 727 (6th Cir. 2014) (quotations omitted) ("A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.").  Whether constructive discharge existed is primarily an objective analysis, however, at the same time, the plaintiff bears the burden to show that his "employer intended to oust him." *Tchankpa*, 951 F.3d at 814.  In effect, Mr. Klimowicz's claim boils down to showing that (1) a reasonable person could find that JCI intended to force him to quit and (2) JCI deliberately created intolerable working conditions to force his resignation.

As to Mr. Klimowicz's claim for constructive discharge, JCI asserts a two-pronged argument: Mr. Klimowicz cannot establish that JCI deliberately created intolerable working conditions during the interactive process and (2) JCI's denial

of an accommodation is insufficient to prove a constructive discharge.  (ECF No. 25 at PageID.157-58.)  Mr. Klimowicz responds that "it was foreseeable [that he] would resign when he was denied a reasonable accommodation and, before that, was left off of work without pay for nine months."  (ECF No. 31 at PageID.1208.)

JCI is correct that an employer's denial of an accommodation is insufficient, standing alone, to support a claim for constructive discharge.  However, that is not the case here.  As discussed above, a reasonable jury could conclude that JCI failed to provide Mr. Klimowicz a reasonable accommodation when it issued an offer letter that made no reference to the accommodations that the parties discussed during the interactive process.  Moreover, Mr. Klimowicz could reasonably understand the letter to be a final offer that would require him to accept the terms and conditions set out in the letter.  Thus, by accepting the position, JCI could require him to perform duties that exacerbated his condition and force him to restart the accommodations process, which could, as played out here, risk another lengthy interactive process, months of unpaid leave, and an unreasonable accommodation.  *Cf. Smith v. Henderson*, 376 F.3d 529, 538 (6th Cir. 2004) (holding that the plaintiff did not prematurely quit, and facts existed showing that his situation would not improve, and quitting was the only viable option).

Worth mentioning, Mr. Klimowicz also made repeated requests to Ms. Graham and Mr. Williams throughout the interactive process asking to be

38

reassigned to a position that the record supports he previously held.  (*See* ECF No.

25-50 at PageID.704, 773, 776, 784.)  He also informed JCI in May that he

intended to file for unemployment to support his family. (*Id*. at PageID.778.)

Desperate to return to work, he provided an additional note from his doctor without

being asked by JCI so that JCI would have a better understanding of his restrictions

and limitations and allow him to return to work.  (*See* ECF No. 31 at

PageID.1187.)

This situation resembles *Talley*.  *See Talley*, 542 F.3d at 1108.  There, the

Sixth Circuit found that the plaintiff had a viable claim because her "eventual

discharge was a foreseeable and intended result of the company's action in

refusing" a necessary accommodation to overcome her disability at work.  *Id*. at

1109.  The plaintiff produced evidence showing that her employer denied her of an

accommodation that her supervisors previously allowed, she approached her

supervisors on numerous occasions to discuss her disability and needed

accommodation, and she was forced to work without the needed accommodation.

*Id*.  The Sixth Circuit reasoned that when an employer fails to accommodate an

employee, specifically in the ADA context, and "an employee makes a repeated

request for an accommodation and that request is both denied and no other

reasonable alternative is offered, a jury may conclude that the employee's

resignation was both intended and foreseeable."  *Id*.  The court in *Talley* ultimately

39

held that "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Id*.

Without a doubt, the Sixth Circuit emphasizes that *Talley* "does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability." *Id*. Though, when the record "suggests [JCI's] real purpose in denying [Mr. Klimowicz's] request was to force [him] to resign[,]" a jury could reasonably find in Mr. Klimowicz's favor on the deliberateness and objective requirements. *See Gleed v. AT&T Mobility Servs., LLC*, 613 F. App'x 535, 540 (6th Cir. 2015).

Thus, the Court finds that Mr. Klimowicz may proceed with his constructive discharge claim against JCI.

## C. Retaliation

As to Mr. Klimowicz's retaliation claim, the Court finds that JCI is entitled to summary judgment as a matter of law because Mr. Klimowicz has not met his burden.

Pursuant to the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

chapter." 42 U.S.C. § 12203(a).  A plaintiff may prove unlawful retaliation by relying on direct or indirect evidence.  *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).  Because Mr. Klimowicz purports to prove his claim through direct evidence and circumstantial proof, the Court applies both frameworks.

When analyzing a retaliation claim that relies upon indirect evidence, the Court must apply the *McDonnell Douglas* burden-shifting framework to guide its analysis.  *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).

Under this paradigm,

> the plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.

*Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. ex rel. J.C.*, 711 F.3d at 697)).  Once the plaintiff has met his burden, the defendant must show that it had a legitimate, non-discriminatory basis for the adverse action. *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).  If the defendant makes such a showing, the burden of persuasion shifts back to the plaintiff to set out specific facts showing that the defendant's "proffered reasons

were not the true reasons for the employment decision, i.e., that the reasons were a pretext for retaliation." *Id.* Pretext can be shown in three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009); *Horner v. Klein*, 497 F. App'x 484, 491 (6th Cir. 2012)

Even if Mr. Klimowicz can meet the low hurdle of establishing a prima facie case for retaliation, he fails to carry the day on pretext. Mr. Klimowicz mistakenly states that JCI failed to submit a legitimate non-discriminatory reason for termination. (EFC No. 31 at PageID.1209.) JCI indicates that it perceived Mr. Klimowicz's refusal to accept its return offer or propose an alternative as abandonment of the position. (ECF No. 25 at PageID.161.) JCI asserts that it was not "required to keep Plaintiff's job open after he made clear that he did not wish to work"–a legitimate reason for termination. (*Id.*); see *e.g.*, *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.").

JCI met its burden, but Mr. Klimowicz's retaliation analysis stopped short of offering a triable fact that JCI's reason for not keeping the job was pretextual. (*See* ECF No. 31 at PageID.1211.) Mr. Klimowicz does not offer any arguments or

42

specific facts that challenges JCI's proffered reason.  Therefore, he cannot prevail on his claim relying on circumstantial evidence.

The Court turns to Mr. Klimowicz's direct evidence claim.  "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful retaliation was a motivating factor in the employer's action" and "proves the existence of a fact without any inferences or presumptions."  *Abbott*, 348 F.3d at 542.  Here, Mr. Klimowicz briefly asserts that JCI's termination letter is direct evidence that JCI unlawfully terminated him. (ECF No. 31 at PageID.1211.)  According to Mr. Klimowicz, it proves that JCI fired him based on his refusal to accept the job position.  (*Id.*)   The Court does not find merit to this argument.

The termination letter reads:

> Despite Johnson Controls' requests on December 1, December 11, December 14, December 20, December 21, 2023, and January 8, 2024, through [Mr. Williams] or Johnson Control's counsel, that you return to work in your prior position as a Journeyman assigned to the GLWA clean water sites, making the same pay and benefits, you have not returned to work and did not notify Johnson Controls of an intention to return to work by January 16, 2024 as requested.  As a result, Johnson Controls has no choice but to determine that you have abandoned your job, and no longer desire to work for Johnson Controls. Therefore, Johnson Controls has ended your employment effective January 16, 2024.

(ECF No. 25-47 at PageID.649.)

On its face, the letter states a non-retaliatory rationale for the termination: JCI believed that Mr. Klimowicz abandoned his job. Even taking the evidence as true, a conclusion that the termination was because of the interactive process, Mr. Klimowicz's disability, the accommodation request, or lawsuit would require "a series of inferences arising from [the] evidence." *Abbott*, 348 F.3d at 542. Retaliatory motive cannot be gleaned from the letter. The evidence is not direct.

Therefore, the Court finds that Mr. Klimowicz does not have a viable retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds a genuine issue of material fact as to Mr. Klimowicz's claims for failure to accommodate and constructive discharge, which precludes the claims from summary judgment. However, Mr. Klimowicz has not set forth specific facts to create a jury question on his retaliation claim, entitling JCI to summary judgment on the claim.

**IT IS ORDERED** that Defendant Johnson Controls, Inc.'s Motion for Summary Judgment (ECF No. 25) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that summary judgment on the discrimination claim (COUNT I) is **DENIED**; and

44

**IT IS FURTHER ORDERED** that summary judgment on the retaliation claim (COUNT II) is **GRANTED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: September 24, 2025